So why don't you make your appearance and then Judge Owens has a set of questions that relate to the video that he's going to answer. Very well. Okay. May it please the Court, my name is Noah Blackman. I represent the appellants in this case, the San Ramon-related police officers and department. I would like to reserve three minutes of rebuttal. Very well. We'll go ahead and begin. And for the record, we notified counsel we would be playing some video exhibits today. We're going to be playing first the real-time exhibit, which is exhibit G, and for the record approximately at 2.19 and no seconds to approximately 2.19 and 41 seconds. And then I will follow with the slow-motion version, which is exhibit HH, and that will stop at approximately one minute and three seconds. Both of these are from the dash cam of the car. So we'll begin with the real-time exhibit G. And counsel, as I pull this up, I'd like you both, obviously, to watch the video because we'll ask questions for both of you. So counsel, if you need to get up and move to another place so you have a better view, that's fine. Excuse me. Is his clock running? Actually, if we could stop the clock, that would be okay, counsel, especially since we're having apparently a little technical difficulty. The courtroom deputy has corrected my error. So I'm going to fast-forward now to 2.18, I'm sorry, 2.19 flat. That'll work right there. Okay. And counsel, you can both see? Yes. Great. All right. Thank you. And playing now. And then, counsel, I'll now play it as the slow motion, and I'd like both of you to be prepared to focus on when the officers are pulling, either he's getting up off the ground or the officers are pulling him up off the ground. Yes, Your Honor. Playing now, Exhibit HH. Okay. So did you want to ask some questions now about that? No, I'm fine. Okay. Why don't you begin? Okay. Thank you. Your Honors, this is not a typical use of force case, especially on this particular record. This case represents a prime example of why police officers should be provided qualified immunity from suit. And in essence, they should be provided breathing room when they're dealing with a very high risk, high danger, rapidly evolving situation. Let me start here. The district court essentially said that looking at this tape and taking all the evidence into account, she couldn't tell whether Mr. Branscombe resisted in general, as I understand it, or either at that point or at later points. And therefore, it was a jury question. Now, can we question that determination? Yes, Your Honor. There's no evidence in this record set forth by Mr. Lagos or his client that he did not resist at the critical moment that was played by the court. There's the tape, what you think about the tape. Right. Well, we have Mr. Branscombe's testimony. But I'm asking a legal question. My understanding of the legal background is that we — you can't appeal a summary judgment denial. You can only appeal the denial of qualified immunity. So are we not bound by the judge's determination as to there being conflicting facts? Well, I believe that the court did not do the full Graham analysis. We are bound by what the court said was this supposed factual issue, which was whether or not Officer Stevens pulled up Mr. Branscombe, which started the struggle, or Mr. Branscombe — So your argument departs from that. Correct. From the assumption that he didn't. He did do that. He did pull him up. Because you have to take the facts most favorable. Okay. So let's assume that. I mean, this is de novo, but let's assume that. So one of our arguments is that that in and of itself, that action by Officer Stevens in this heated, dangerous situation is not evidence of any excessive force. So even if that occurred, that is not — there's no case law that says the officer could not do that at that point in time. In fact, the cases say — But why would they do that at that point in time if they were trying to — if all they were trying to do was to handcuff the guy and get him into control? Well, the reason, and it's in the record, is — They said they didn't do it. But if they did do it, what would be the justification for doing it? Well, Officer Stevens is reacting to Mr. Branscombe pulling his hand away during the time when Officer Stevens is trying to control his hands. Then something happens that Mr. Branscombe gets off the ground and moves over to the side. Mr. Branscombe doesn't remember the point in time — Right. I think you've missed the point of Judge Berzon's question. Because the district court has found that there is conflicting evidence here, you're going to have to assume the defendant's version of the facts, or at least whatever facts the defendants think that they can prove. Whether they can or not, whether there's just tons of witnesses against it at this stage in order to prevail, you've got to assume that we think that there's a Fourth Amendment violation and then tell us that your officers have qualified immunity. But you're going to have to assume that Officer Stevens had him secure on the ground and that he decided to pull him up, which — and that that action was not necessary in order to subdue him. Well, let's assume — And counterproductive to subduing him, actually. Okay. So let's assume that. That's why we — that's exactly why we have qualified immunity. I mean, here we are breaking down in milliseconds these brief actions by these officers in what even the district court admitted was the highest threat profile situation. So Officer Stevens is entitled to some breathing room for whatever tactic he believes at that point in time is necessary to control this gentleman. So if you could look at this thing and say he was pulling him up, the guy never resisted, never resisted, not only didn't resist then, because I think that's the way you read the district courts, and they punched him and they chased him. Well, if the — if Your Honors look at that video, what we do see right after that point in time is we see Mr. Branscombe move over towards the van, presumably at that point not in contact with an officer. Then we see Officer Stevens tackle him. So there's clear evidence that he lost control. But the defense's argument here, and I don't know whether it's a winning argument, okay, it's — and I have my own views, but they're irrelevant here, is that if the officer has pulled him up, he's pulled him up at a time when that's exactly the wrong thing to do. He's got him on the ground. And if he's pulled — if he's pulled him up, then Mr. Branscombe may simply be reacting to that. In other words, the officer may have pulled him up for the precise reason that it will free him to punch him, to get that — that attention grabber. And the other officers can tase him in order to punish him for what he's just done. So that's — that's a theory of — that's a theory of the case. I'm not sure you get qualified immunity for that. Well, I don't think that action by Officer Stevens, let's assume that occurred, is excessive force in and of itself, okay? But that's the way you briefed it. And the point that I think Judge Bivey is making, or in any event I'm making, is that's not the whole story. The question is that it was part of a larger — that the judge — the district judge's reading of this record is that you can tell that Mr. Branscombe was ever resisting as opposed to reacting to people using force against him, and that the force that So therefore, you have to look at the whole thing and not just whether he pulled him up or not, but pulling him up was — was the first provocation. And there's certainly case law saying that when there's provocation, i.e., when the police do something that they don't need to do and that has even some force, even if not a lot of force, then what happens afterwards has to be looked at in light of that provocation and not in isolation. I mean, your whole briefing was in isolation. And the question is, if we don't look at it in isolation, but look at what happened afterwards as part of the larger reaction, then what? Well, that's what I think the district court failed to do here. I think the district court failed to look at the totality of the circumstances facing these officers. I mean, on one level, they — I mean, they did a good job. I mean, on one level, they did, because they didn't shoot the guy as he was doing all these, you know, terrible, dangerous things, and they — No civilian — no other civilians were injured as far as I understand. That's correct. I mean, under the Plumhoff case, Supreme Court case, if this had continued, if he had been able to get his vehicle off of that area, officers would have been likely entitled under the Fourth Amendment and qualified him to shoot Mr. Branscom. Right. Okay. So now he gets out of the van. But still, we have the situation that we have, which is the guy's on the ground, hands down, prone. And if you think that — and if you can look at that and it looks like somebody is pulling him up, or at least somebody could think that, then what? Not just the pulling up, whether the pulling up is excessive for us, but how does that feed into the rest of what happened? Well, the rest of what happened, if indeed he had surrendered and submitted a total take-me-to-jail position, why is there this 81-second struggle after that, where we've seen on the taser cameras his arms are underneath his body? That's all — that's not an argument for qualified immunity. That's an argument as to why you're going to win in front of a jury. Well, I think it relates to — the district court did not analyze the qualified immunity issues with, for example, the other four officers, who, the state of the record is, they see — Your argument, counsel, is there's no Fourth Amendment violation. That's not qualified immunity. That's — you're going to win that on the merits. Qualified immunity only comes in if we think there's a constitutional violation. So we have to assume that there's a constitutional violation for you even to make your qualified immunity argument, which is what gets you here today. Otherwise, you just — you have to go before the jury and just say, all of the officers testified that this is what happened. Mr. Branscombe doesn't remember. Here's the tape. Judge for yourselves. Vote for the officers. The only reason that I guess we're here, I think, is because I think we have a creative attorney, Mr. Lagos. He's based his whole case on what's seen in the video, because his client basically doesn't remember how he got from the ground over towards the van. There's an 11-second gap here. So there's no evidence in the record other than potentially Mr. Lagos's arguments about what he sees on the video, because his client can't even bolster the fact that he was indeed picked up. The officer denies it. So I think the court did not look at the totality of the circumstances that these officers faced in determining that that one issue was — that there was a factual issue as to whether the officer picked him up. Do you think you can look at that tape and say definitely they didn't pick him up? They didn't do that? I believe so, because all the evidence we submitted is that's not what happened, basically. That's not what Officer Stevens happened. That's not what I see in the video. I understand, but I'm asking you about if you were looking at the video. Suppose Officer Stevens and everybody had said what they said, but you looked at the video, and clearly they lifted him up after he was subpoenaed, after they were very close to putting the handcuffs up, and for no reason that you can perceive. Suppose that's what it showed. That would overcome whatever they were saying, right? I mean, that's essentially what the Supreme Court said in Scott v. Howard. I mean, just look at the tape, all right? So if it were clear, it wouldn't matter what they said, right? Well, I think the tape needs to be bolstered by admissible evidence other than just the tape. So you're saying even if it were clear, that wouldn't matter? Well, I don't think it's clear. I know, but — so therefore, if it's not clear — you just said it's not clear. So if it's not clear, then do we — who decides what it shows? Well, it would go to the evidence in the case. Mr. Branscom never testified that he was pulled up off the ground, so there's no evidence of that. So what we have undisputed on this record is our position. We have Officer Stevens saying that he's attempting to corral this gentleman. So you're saying we don't worry about the ambiguous tape? No. I'm saying that the tape should not be given undue weight here based upon the state of this record. Counsel, let me ask you. I mean, just to be clear, as I read the Ninth Circuit case law and the Supreme Court case law, we can't reweigh the facts to say whether summary judgment should have been granted at this point. As I understand the case, we have to assume the following. One, that Mr. Branscom led the police on a very dangerous chase and, you know, behavior that is terrible, what he did, and could have hurt a lot of different people. When the officers came upon the scene, they were in a very tough situation. You don't know if more guys are in the van. The wheels are still spinning. He could have accomplices jump out. Very high-tension situation. Granted, both of those. We have to assume, I think, based on what the district court did here, that at the time the officers came upon Mr. Branscom, he was not resisting. Now, I understand your arguments to why the officers say he wasn't. I see the video, and people can have — we can all have our own opinions on that. But we have to assume for now that he wasn't resisting and that despite him not resisting, force was applied to him. Am I wrong in my legal analysis that that's what we're stuck with at this stage? Well, I think because of the backdrop of this, Your Honor, I think you're correct up to a point, which is these officers have a lawful right to use force. That's undisputed. And because of the severity of the crimes and the danger of the situation, they have the right to not just walk up to him and use kid gloves on Mr. Branscom, not knowing if  So, we cited the case law from the 11th Circuit and the 7th Circuit, the Johnson case and the other case, the Crenshaw case. Officers do not need to assume this gentleman is surrendering based upon all of his prior behavior. In fact, the reason this pursuit ended was he crashed his van. He did not pull over and suddenly lay on the ground and say, okay, okay. That may be a different factual scenario. In this scenario, the situation that these officers faced, from their perspective, they're entitled to some breathing room on the decisions they're making, including whether or not Officer Stevens is pulling up Mr. Branscom briefly as the district court seemed to think occurred. So this is exactly why qualified immunity is provided to officers. If he had his arms, what they claim was the resisting was that he moved his arms? That's right. That's undisputed. Officer Stevens says that when he tried to get his arms from his head, start to pull back behind his back where you handcuff a suspect, he pulled one of his arms away. So at that point, Officer Stevens is trying to maintain control of him. And that's when we see Mr. Branscom dive over towards the van and Officer Stevens tackle him to the ground. It sort of belies logic that Officer Stevens is going to try to pull up Mr. Branscom off the ground for some reason when a split second later he's diving on top of him. The record is replete and undisputed that he was just trying to control him. If he wanted to get his arms around him, then he wouldn't do it that way. But can we even dispute what the record says? I mean, aren't we locked? I mean, getting back to my question, aren't we locked into those four things I just discussed? We can't – if the district court says, I find that a jury could infer that the defendant – I'm sorry, that the plaintiff in this case, Mr. Branscom, did not resist at this stage of the litigation, aren't we stuck with that? Yes and no, because I don't believe the district court did the full Graham analysis. So even – I think the court was fixated on that one point, okay? But the Graham analysis is several different factors. I think if the court had run through those factors, and the court's report – I mean, the court's order is really short on reasoning on that point. So I don't believe the court even looked at it from the perspective of officers. But you agree, I take it, that if he didn't resist, which I guess would include moving his hand, then there was no reason to pull him off the ground and put him – and put those arms around him and tackle him. No, I don't agree with that, Your Honor, because of this context. This is the highest threat profile of these officers. They don't need to – So your position is that even if he was proed on the ground and in fact not moving, they still could do that? Yes. Well, they can take every reasonable action they need to to get this gentleman into custody. So it's reasonable to lift him up and tackle him and then start punching him and all that? Even if he was proed on the ground and you could have just handcuffed him? Yes, because when we're breaking down that one little critical moment, these officers are having to force to make these split-second decisions. So once Mr. Branscombe moves away, which we see in the video, and we see the rest of the struggle – But that assumes the answer to the question of whether he resisted. Well, but we see the resistance. We see him hiding his arms. So we don't know whether he's moving away because he's being tackled – lifted and tackled or whether he's been moving away of his own accord. That's the question. But he hasn't – he had – Mr. Branscombe never provided any evidence to say that once he laid on the ground, he never resisted after that. He doesn't remember, so there's no evidence of that. So that's undisputed as far as I'm concerned. And I think we're running out of time here, but Counsel, I take it your point is that even when – in light of this type of chase, this type of danger, that even someone who is appearing to not resist, you read the Eleventh Circuit case law to permit at least some force to still be used. Certainly, the higher the danger to the officers, the more latitude they're entitled to use some force to affect this arrest, which they had a lawful right to do. They had a lawful right to put their hands on this gentleman. Well, they certainly did that. That's true. And they did. But that's – but the question is whether – well, okay. I think we understand it, Your Honor. Thank you very much. Thank you. Thank you, Counsel. It's a hard case, an interesting case. Good morning, Your Honors. My name is Panos Lagos, and I do represent Jordan Branscombe. This case is about a citizen's clearly established right under the Fourth Amendment to be free from unreasonable seizure. This Court should sustain the trial court's decision with respect to denying the qualified immunity request made by the defendants. Yeah. Under the Supreme Court case law, if we looked at that tape and we said, she's just wrong, I mean, you can just see clearly that he was resisting and – I'm not saying I'm saying that, but if we could look at that tape and say that, then would we still be bound in terms of Scott v. Harrod and Plumhoff by her summary judgment determination, if the tape were clear? If the tape were clear that what? That it showed? That it didn't show what she said. That there was no way you could look at that tape and think that he didn't resist. Right. Hypothetical. He had an ax, and he started swinging it at the police officers. And somehow the trial judge just missed that. Yes, you could review that, yes. And in answer to your earlier question of counsel posed by the panel that was not directly answered, the panel does have the authority to review a finding of the trial court on a – on what the trial court views as a material fact in the case. The materiality of that fact can be reviewed. But is there any – is there any issue of that in this case? I gather the issue is what happened, not whether there's a material – Good question. The only fact that was found to be material, which is how do we interpret this video? What did happen? And the judge basically said she couldn't tell, and it is in dispute, and that cannot be decided by her. That's what – and it is a material fact. I have to agree with the judge that interpreting this tape – Now, is your understanding that her determination with regard to the material – the dispute of material facts as to your client's resistance was both as to the initial instigation and what happened afterwards? No. She did not say that because of this chase that was material to a determination of the propriety of the force. I'm not talking about the chase. I'm talking about whether he resisted – I mean, my understanding is that if the initial force, although relatively minor, i.e., picking him up and tackling him, was completely unjustified because he didn't resist at that point at all, but they did it. And if he then resists, let's say – was she then saying, well, he didn't resist after that either, or was she saying that – because the officers claimed that he was kicking and flailing and so on. And there was certainly a tussle going on, but it could have been in reaction or involuntary reaction to what was happening to him. So is she saying that, i.e., he never resisted, or is she saying that any later resistance was essentially a reasonable response to the provocation, or it doesn't matter what she was saying? She didn't say either way. Well, I thought she said sort of generally he didn't resist. No, as to what he – as to what occurred after he was pulled off the ground, whether or not he was resisting during the wrestling that was going on. She didn't say anything, but I think what can be reasonably inferred is that, as I said in my brief, whether or not he was pulled up off this position, a tactically inappropriate move, as admitted by the police chief, frames the use of force that then occurred and or any resistance that later occurred. As you said, if he was provoked unnecessarily so that people could inflict the punishment they did, that does frame the force issues. I mean, not if he had punched them or something, but there's no allegation that he did that. That my client did? Yes. No, there's none. There's no claim. They're saying he was kicking and flailing, essentially. That is said, but we don't see it, but that is what is said. Counsel, going back to a point that opposing counsel was making, I think we all can agree that the events that led up to this were very dangerous, very scary. Your client then is on the ground, he picks up his head, and I believe he says, I didn't do anything. Now, an officer, I think, could interpret that as he's not complying because he's, he's getting down, he's kind of rearing up. Then when they get on top of him, then we see him being, I think, pulled up and the whole taser and the whole thing happens. Why is counsel wrong that in a situation where someone has engaged in this type of conduct, that the officers can apply at least some level of force to this guy to make sure he's really compliant? Because he hasn't been compliant for that whole chase. I mean, for 20 minutes, they had sirens on, he wasn't stopping, he wasn't stopping. The only reason why it stopped was because the van got caught up. There's 11 circuit cases. I'd like to hear your response to those. Let me answer your question first. Sure. What transpired before is everything that you've described, but he surrenders. And at that point, the job of the police is just to simply take him into custody. And I agree, there is some force that an officer is entitled to use to accomplish that task. And the question is, under Graham, was it necessary force, inappropriate force under all the circumstances? So I don't disagree with force. Now, the question is — But doesn't it also have to be the case, in light of what happened earlier, that they are entitled to be somewhat — Rougher with the guy. Not rougher. What I meant to say was something a little different. That they are — that a very small appearance of resistance could have been taken seriously in light of the fact that he was so out of control earlier. Right? It should be taken seriously, but the training that is supposed to kick in is to follow their training. So if, for example, they really thought that he was — that he took his hand out from the — when the officer tried to put his hand on him, he pulled his hand out and put it under his waist. That's what they claim. Right? Now, if that happened, quite aside from whether he got up on his knees, would that be a reason to pull him up and tackle him, given what happened earlier? Would it be a reason? No. It would be tactically very inappropriate. It would expose the officers to a very dangerous situation. The most opportune position for handcuffing is to be in the position that he was ordered to go to. That's why he was — Yes, but I'm positing that he — in a fairly small way that, in other circumstances, maybe they couldn't react to. But that given the fact that he had shown himself to be quite out of control in terms of his concerns about danger, maybe they could react to it more than they could otherwise. So, in other words, the context has something to do with this. Well, most definitely it does. And I want to get to the distinguishing of the defendant's cases. My answer to your question is it's very factually dependent on a given situation, just as Graham tells us. When he's in that position and he's been ordered to show his hands and he's complied, there are a couple of things that should be triggering here. He's complying, number one. He's helpless, number two. Okay. But I don't know what the tape shows about this, and I'm going to see. But if we could say from the tape that they're right when Stevens tried to grab his right arm, he pulled his arm out away from Stevens and he put it under his stomach, which could have suggested that he had something there. Let's suppose we thought the tape showed that. Now, first of all, did the judge rule on whether the tape showed that? Is that part of her determination there was no resistance? No, she did not make that determination. She couldn't tell. She couldn't tell is what I meant. That was part of her determination that you couldn't tell. So we would be bound by that? Yes. But if we thought it did show that, definitely, then what? Then could you employ Scott v. Harris to substitute your judgment? Yes, you could. And if we did, then the lifting up and tackling him might have been okay? It might have been. So you understand that her determination encompasses that as well? I do. Not just whether he got on his knees. But I'm here to tell you, and I've been telling the world, that since we have Scott v. Harris employing that reasoning, and given what this tape does show, it does show unnecessary and inappropriate force throughout the surrender. When you employ the Graham factors, he can't come here and say there was a significant risk of harm to the officer or anyone else when my client surrendered. That is the critical point in time that this, my case, starts. It started in San Leandro 23 miles earlier, yes. That's what led up to it. But the job of the officers were very simple. And tactically, they didn't follow their, they weren't either honest and didn't follow proper tactics. And they inflicted unnecessary and inappropriate force. What does the record show, by the way, about the, if anything, about the injuries to your client? Oh, the injuries? A punctured lung, $40,000 of bills, a bruised up face, and a back and an eye issue. And photographs to go with it. Photographs that show his face that was not injured when he first exited the car. How did he end up with a punctured lung? Not clear. He was struck. Do you see him in a violent hustle? That's a good question. I don't know. It could have been a fist. Distinguishing the cases. I didn't even read them. But I read them for the last four weeks just to prepare for today. Because I didn't think they would ever find a case where a person had totally surrendered in plain view, no matter what that person did, that would justify pulling a person up and inflicting the punishment that I saw. And indeed, when I read the cases, they do distinguish. They have very grossly distinguishing facts. People hiding in between dumpsters. Hiding in the woods. A person exiting a car. This is after they've committed some serious felonies. Person exiting his vehicle after the stop. And the dog had already been released because it was a drug call. And so unfortunately, when the gentleman getting out of the car claims he got on the ground, which is all contradicted, said the court. The dog had him for a second or two. Five or ten seconds before they pulled the dog off. Totally different factually from our case. Total surrender case. And I have to come back to Graham. Graham was utilized as the basis for the defendant officers for the denial of their qualified immunity motion in Blankenhorn. Similar circumstances. And the court said, you don't have to go back further than Graham to know that you cannot inflict any unnecessary and inappropriate force on a subdued person. Now, what is subdued is a good question. We have many cases cited by the defendants where we have it established you can't inflict any force or use any force on a handcuffed person. But in Blankenhorn, they noted that the person who was on the ground was in the control of the officers. This officer had every ability to control the situation. And he chose not to. And he did so at the peril of his own officers and for all the reasons we hear in their brief. He pulled him up off the ground. He denied doing that. So I'm here to ask the court under Scott v. Harris and Rule 57A and the prior authorities in this circuit that permit for that where a video contradicts the version of the facts by another party. I heard Mr. Blaskin say that he denied that the officer pulled him up. He didn't think it happened. He's not entitled to that. I have a video that says otherwise. And it's an insult to all of us to pretend that didn't happen here. It did happen. You're not asking us to cry summary judgment for you. I am. Is that in your brief? Yes, it is. Do we have authority to do that? I sure do. No, we don't. I have given you the authority and I can give you more. I've asked you under the Rule 56F. I've made a cross motion as I'm entitled to. But we don't have authority over the summary judgment motion. Yeah. It's an interlocutory appeal. I ask you to read the authorities. And I'll start with Keystone Land and Development Company of this circuit. 353, Fed 3rd, 1070 of the 2003 case. Is that a qualified immunity case? No. But it's a decision of this circuit that granted the nonappealing party judgment under this rule and the authority set forth in 28 U.S.C. Section 2106. It's a self-defeating request. What's that? If we have the authority to do that, then we have the authority to review the district court's determination that there was, in fact, a material. You might not be happy with the result if we were called on to do issue summary judgment in this case right now. I hear you. But you do have the authority in 28 U.S.C. Section 2106, Scott v. Harris. And the authorities I cited in my brief in the conclusion, starting with Morgan Guaranteed Trust Company. Again, the court in that case said it wasn't necessary for the nonappealing party to have judgment entered in their favor after cross motions of summary judgment, even though it was not an issue. But the only circumstances is when it's, quote, inextricably intertwined. And this whole set of law says it isn't inextricably intertwined, that the qualified immunity question is a separate question. I understand the point. All right. Thank you. Thank you. I'm giving you a minute. One minute. Thank you, Your Honor. Counsel said that we did not cite one case, or we only cited a case or something that affected this last minute surrender in this case. In fact, there's three cases that talk about, even if a suspect appears to be potentially surrendering, there's been three cases, Johnson, Crenshaw, and the case that followed them, Holloway, that said even if a dog comes up and bit a suspect who supposedly had surrendered, one case, dog bit the gentleman 31 times, that was not to be, not found to be a Fourth Amendment violation. And the Johnson case... Coincidence, those cases are all about dogs, i.e. dogs aren't people, and they don't know whether the guy's surrendering, and the dog has already been released by that point. Well, that's an interesting question. What? That's an interesting question. I don't know. But I think, obviously, in this circuit, dogs are more severe force than an officer who might have, in a split moment, pulled up a suspect to try to gain control. You know, the Johnson case specifically says, and I think it answers Judge Owen's question, that not all surrenders, however, are genuine. The police are entitled to err on the side of caution when faced with an uncertain or threatening situation. What we just did today, Your Honors, in this nice confines here, is analyze these split-second decisions of these officers faced with one of the most I don't believe, even if we assume that Mr. Branscom's came off the ground a little bit by Officer Stevens, that that was a provocation. In order for you to prevail on the qualified immunity, I presume, but this is why it's a jury question, or on the Fourth Amendment issue, you would have to say, or on the qualified immunity, that even though he wasn't resisting, they could have thought he was resisting. Correct, because this is viewed not from Mr. Branscom's thought process, or I wasn't giving up, it's viewed from the perspective of officers, and officers are supposed to get allowance for having to make these really difficult split-second decisions, not only with their mind, but with their bodies, to react to these  And certainly, everybody, I think, concedes this was of the utmost threat profile that officers could face. Okay. Thank you very much. Thank you, counsel. Thank you. Thank you.
judges: Berzon, Bybee, Owens